**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JEAN CELESTIN,<br> *Plaintiff*,<br><br> v.<br><br> LIFESPAN SCHOOL SOLUTIONS, INC.,<br> *Defendant.* | No. 3:24-cv-1704 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Mr. Jean Celestin ("Plaintiff") filed suit against Lifespan School Solutions, Inc.

("Defendant" or "Lifespan") alleging racial discrimination in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and disability discrimination in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

The Defendant has moved for summary judgment on these claims. *See* Mot. for Summ.

J., ECF No. 29.

For the following reasons, the Defendant's motion for summary judgment is

**GRANTED**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    **A.  Factual Background**

Mr. Celestin is a resident of Connecticut, and Lifespan is a Rhode Island corporation that

is licensed to operate in Connecticut. Not. of Removal at 11, ECF No. 1.

Lifespan runs the Bradley School in Uncasville, Connecticut, which is a private, school-

funded educational program for children and adolescents whose psychiatric and behavioral needs

cannot be met in a public-school setting. Deft's Statement of Material Facts ¶1, ECF No. 29-2

("Deft's SMF"). The Bradley School is led by Chief Administrator/Clinical Director Stephen Swartzlander, PhD. *Id.* ¶3.

In February 2019, the Bradley School hired Mr. Celestin as a classroom behavior specialist ("CBS"). *Id.* ¶4. His employment was allegedly at-will. *Id.* ¶5. As a CBS, Mr. Celestin was responsible for assisting the special education teachers in developing and implementing academic, social-emotional, and behavioral programming consistent with students' individualized education programs. *Id.* ¶6. His responsibilities included attending morning staff meetings, conducting bus duty, checking students for contraband, supervising the hallways and the cafeteria, assisting students with activities of daily living like toileting and self-care, and performing certain end-of-day duties. *Id.* ¶¶7-8. The role also allegedly required the ability to lift up to fifty pounds; reach with hands and arms; grasp and hold objects; bend, squat and kneel without limitation; escort combative students for short distances; and, if necessary, utilize de-escalation strategies such as physical management, restraint, or protective holds. *Id.* ¶¶9-10. The Bradley School was allegedly short-staffed, which required the CBS team to cover classrooms with varying needs. *Id.* ¶16.

In 2019, a staff member allegedly repeated a student's use of a racial slur during a meeting, but Mr. Celestin alleges he did not file a complaint because he was unaware of the procedures to do so. *Id.* ¶54.

Around 2021, Mr. Celestin's colleagues "Jeffrey" and "Jermaine" informed him that Dr. Swartzlander allegedly stated that minority employees dressed "too urban." Obj. to Mot. for Summ. J. 95-96, ECF No. 34 ("Obj.").

On August 13, 2022, Mr. Celestin allegedly sustained a non-work-related injury to the Achilles tendon in his right ankle that required surgery. Not. of Removal at 11. On August 17,

2022, Lifespan received documentation from Mr. Celestin's healthcare provider indicating that he was scheduled to undergo surgery on August 19, 2022, which would require a medical leave of absence. Deft's SMF ¶18.

Lifespan's absence-management vendor, ReedGroup, approved Mr. Celestin's request for leave under the Family Medical Leave Act from August 13, 2022 through November 5, 2022, and allegedly provided an additional thirty days of leave through December 5, 2022. *Id.* ¶19.

Mr. Celestin allegedly did not return to work after the expiration of his approved leave on December 5, 2022. Deft's SMF ¶20.

On December 13, 2022, Lifespan allegedly issued a letter to Mr. Celestin stating: "If you do not secure approval for your continued absence or you are unable to be cleared fit for duty and return to work by December 20, 2022, you will be separated from employment effective December 20, 2022." *Id.* ¶¶22-23; Not. of Removal at 12.

On December 14, 2022, Mr. Celestin allegedly sent an e-mail to Greta Francis, Lifespan's clinical director, stating he had been in contact with ReedGroup regarding his absence. Deft's SMF ¶24; Not. of Removal at 11. Ms. Francis allegedly responded that any further extensions of leave would need to be coordinated through Lifespan's absence management team and evaluated as a request for accommodation under the ADA. *Id.* ¶25.

On December 20, 2022, Mr. Celestin allegedly submitted an accommodation request seeking an extension through the date of his next medical appointment in early January of 2023. *Id.*; Deft's SMF ¶27.[1] Mr. Celestin's healthcare provider allegedly submitted a letter stating that Mr. Celestin's impairment was expected to continue for approximately one year following surgery, that he could not ambulate without assistive devices, and that he would be limited in his

---

[1] Mr. Celestin alleges that the request sought leave through January 15, 2023, while Lifespan alleges the request sought leave through January 5, 2023. Not. of Removal at 12; Deft's SMF ¶27.

ability to stand, climb and drive. Deft's SMF ¶28. His provider also noted that he would only be able to perform seated work and recommended that he be excused from work through at least February 17, 2023. *Id.* ¶29.

Following receipt of the letter, Lifespan allegedly advised that it could not accommodate an extension of leave through February 17, 2023. *Id.* ¶30. Mr. Celestin allegedly spoke with Stephanie O'Hanley, the leave of absence manager, and stated he was hoping to be cleared to work after his January doctor's appointment and asked that his leave only be extended through that date. *Id.* ¶31.

Mr. Celestin alleges that on December 23, 2022, Lifespan issued a "determination letter" granting Mr. Celestin's request and approving leave through February 12, 2023, and that on December 28, 2022, Lifespan allegedly issued a decision, signed by Dr. Stephen Swartzlander and human resources employee Carol Bernardo, denying Mr. Celestin's request for accommodations. Not. of Removal at 12. Lifespan alleges that on December 28, 2022, it agreed to grant Mr. Celestin's request through January 6, 2023, based on his representation that he would be cleared for work at that time. Deft's SMF ¶32.

Following his doctor's appointment, Mr. Celestin was allegedly cleared to return to work without restrictions starting on January 9, 2023. *Id.* ¶33. Mr. Celestin allegedly returned to work but was only able to work approximately two and a half shifts, on January 11 and 12, before experiencing pain and seeking medical care. Not. of Removal at 12; Deft's SMF ¶¶34-35.

On January 13, 2023, Dr. Fred Fenton of Hartford Healthcare allegedly authorized Mr. Celestin to return to light duty work, advised him "to the extent possible [to] limit the amount of walking," and required that he wear a boot. Not. of Removal at 12; Deft's SMF ¶36. Because of

these restrictions, Mr. Celestin allegedly requested a light-duty assignment and/or additional leave through his next doctor's appointment on February 2, 2023. Deft's SMF ¶37.

On January 18, 2023 and January 19, 2023, Dr. Swartzlander and Ms. Bernardo, respectively, allegedly denied Mr. Celestin's requests for accommodation, stating that the requests imposed an "undue hardship." Not. of Removal at 12.

Although the denials for accommodations were allegedly signed on January 18, 2023 and January 19, 2023, the denial was allegedly communicated to Mr. Celestin on January 17, 2023, and his employment was terminated that same day. *Id.* On January 19, 2023, Mr. Celestin was allegedly notified of his termination. Deft's SMF ¶48.

Mr. Celestin alleges that a white female employee's request for accommodation for light duty work was granted. *Id.* ¶49; Not. of Removal at 13. He also testified that an African American CBS previously received light-duty work due to a hand injury. *Id.* ¶52.

In March 2023, managerial employees, including Dr. Swartzlander, allegedly used a racial slur during a staff meeting. Not. of Removal at 13. Mr. Celestin was not present during this alleged meeting, which took place several weeks after his termination. Deft's SMF ¶53.

Mr. Celestin submitted complaints to the Connecticut Commission on Human Rights ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") and received a release of jurisdiction from each agency on June 7, 2024 and July 2, 2024, respectively. Not. of Removal at 13. Lifespan alleges that Mr. Celestin was aware of the workplace anti-discrimination policy but did not file any race-based complaints before his termination. Deft's SMF ¶55.

### B. Procedural History

On September 23, 2024, Mr. Celestin filed a Complaint and initiated suit in Connecticut Superior Court, Judicial District of New London. Not. of Removal at 1.

On September 26, 2024, Lifespan was served with process in the state court action. *Id.* at 2.

On October 24, 2024, Lifespan removed the case to this Court. *Id.*

On November 5, 2024, Lifespan filed a motion for an extension of time to respond to the Complaint, Mot. for Extension of Time, ECF No. 15, which the Court granted, Order, ECF No. 16.

On November 22, 2024, Lifespan filed a motion to dismiss Counts One, Three, and Five of the Complaint. Mot. to Dismiss, ECF No. 17.

On December 5, 2024, Mr. Celestin indicated no opposition to the motion to dismiss and stipulated to the dismissal of Counts One, Three, and Five with prejudice. Resp. to Mot. to Dismiss, ECF No. 18.

On December 6, 2024, the Court granted Lifespan's motion and dismissed with prejudice Counts One, Three, and Five of the Complaint. Order, ECF No. 20.

On January 15, 2026, Lifespan filed a motion for summary judgment on Counts Two and Four. Mot. for Summ. J., ECF No. 29.

On March 11, 2026, Mr. Celestin filed an objection to the motion for summary judgment. Obj. to Mot. for Summ. J., ECF No. 34 ("Obj.").

On April 8, 2026, Lifespan filed a reply to the Plaintiff's objection. Reply, ECF No. 38 ("Reply").

On April 9, 2026, Lifespan filed a response to the additional material facts stated in the Plaintiff's Rule 56(a)(2) statement of undisputed facts. Response, ECF No. 39.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

Lifespan has moved to dismiss the remaining claims of Mr. Celestin's Complaint, namely Count Two alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and Count Four alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

The Court addresses each claim in turn.

8

### A. The Title VII Claim

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, claims of employment discrimination are governed by the burden shifting analysis the United States Supreme Court established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citation omitted) (analyzing Title VII sex discrimination claims); *Grey v. Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 321–22, 328–29 (D. Conn. 2004) (evaluating constructive discharge and hostile work environment claims under Title VII and CFEPA); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177–78 (2d Cir. 1996) (in the context of a Title VII retaliation claim).

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case that "(1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was subject to an adverse employment action; (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on race." *Woods v. Ruffino,* 8 F. App'x 41, 42 (2d Cir. 2001) (citations omitted). After the plaintiff meets this "initial burden," it becomes the employer's burden to establish a legitimate nondiscriminatory reason for its actions. Then, "the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999)).

Lifespan argues that Mr. Celestin cannot establish a *prima facie* case of race discrimination under Title VII since he has admitted that he could not perform the essential functions of his job as a CBS, even with an accommodation, thereby making his job performance unsatisfactory. Mot. at 24.

Lifespan also argues that Mr. Celestin has not offered evidence or facts that give rise to an inference that his termination was due to his race. *Id.* Specifically, Lifespan argues that Mr. Celestin's argument that a white female employee was given light duty as an accommodation, without details about the employee or the circumstances of her accommodation, is insufficient to establish an appropriate comparator. *Id.* at 25-26. Lifespan argues that Mr. Celestin lacks any personal knowledge about the alleged comparator, he provides no probative evidence, and he fails to show that the employee was similarly situated to him in all material respects. *Id.* Lifespan further argues that the "Plaintiff's own testimony undercuts any inference of racial animus," since Mr. Celestin admitted that he had previously been given a light-duty assignment for approximately a month following an injury, as had another Black CBS. *Id.* at 27.

Next, Lifespan argues that Mr. Celestin's remaining allegations in support of his race discrimination claim fail. Lifespan argues that Mr. Celestin's allegation that his co-workers used a racial slur does not raise an inference of racial discrimination, since he has not shown that any individual involved in his termination made race-based comments, and the text messages on which he relies were stray remarks describing alleged events occurring a few months after his termination. *Id.* at 27-29. As to Mr. Celestin's allegation that he and another African American employee were improperly assigned to two African American students, Lifespan argues that Mr. Celestin "provides no evidence linking these student assignments to race" and does not establish a connection to his termination, which occurred two years later. *Id.* at 29. And with respect to a

2019 meeting where a staff member allegedly repeated a student's use of a racial slur, Lifespan argues that this incident occurred more than three years before Mr. Celestin's termination, and Mr. Celestin never filed a complaint, despite his knowledge of how to do so. *Id.*

In response, Mr. Celestin argues that he has established a *prima facie* case of race-based discrimination. First, he argues that he was qualified to perform the CBS job, he carried out the essential functions of the position upon his return to work in January 2023, and was only fired thereafter. Obj. at 21-22. Second, he argues that the white female comparators, the use of a racial slur in the workplace, and the presence of "racial tension" are sufficient to create an inference of discrimination. *Id.* at 22.

He argues that three white employees were accommodated with light duty work due to their medical conditions around 2022, one of whom allegedly suffered a similar ankle injury while employed as a CBS. *Id.* at 23. He notes that the other two white employees he identified allegedly worked in the office on light duty for up to two weeks. *Id.* Mr. Celestin also argues that the light duty work previously assigned to him and another Black CBS were distinct, since they involved work-related injuries that are "governed by a statutory scheme compelling particular actions by the employer." *Id.* at 25.

Next, he argues that Dr. Swartzlander was aware of the use of racial slurs in the workplace, took no action to remedy it, and used a slur himself following Mr. Celestin's termination. *Id.* at 26. Because of the particular egregiousness of the slur used, he argues its alleged repeated use supports an inference of discrimination. *Id.* at 27.

The Court disagrees.

There is no dispute that Mr. Celestin is a member of a protected class, or that his termination constituted an adverse employment action. The parties only disagree as to whether

11

"his job performance was satisfactory" and whether "the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on race." *Woods v. Ruffino,* 8 F. App'x 41, 42 (2d Cir. 2001) (citations omitted).

The Court discusses each issue in turn.

### 1.  The Qualification Requirement

The "qualification" or "satisfaction" requirement of the *McDonnell Douglas* test "refers to the criteria the employer has specified for the position." *Thornley v. Penton Publ'g,* 104 F.3d 26, 29 (2d Cir. 1997); *see Gonzalez v. Connecticut,* 151 F.Supp.2d 174, 180–81 (D. Conn. 2001) (applying *Thornley* to a Title VII racial discrimination case). A plaintiff establishes this prong "by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance." *Thornley*, 104 F.3d at 30. "Absent a showing by the plaintiff that the employer's demands were made in bad faith . . . an employer . . . is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury." *Id.* (citations omitted).

The Second Circuit has repeatedly held that "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; [the] plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001) (quoting *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks omitted)).

"Evidence of whether a particular function is essential includes, but is not limited to . . . The employer's judgment as to which functions are essential . . . Written job descriptions prepared before advertising or interviewing applicants for the job . . . The consequences of not

12

requiring the incumbent to perform the function[.]" *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)).

The essential functions of a classroom behavior specialist, as outlined in Lifespan's job description, include "assisting students with activities of daily life such as toileting," "physical management of students," lifting up to fifty pounds, bending/squatting/kneeling without limitation, physically escorting combative students, occasional running for short distances, and frequent standing and walking. Ex. B, Position Description, ECF No. 29-3. Lifespan does not allege that Mr. Celestin was initially unqualified for the position, or that his performance before his ankle injury was unsatisfactory, only that following his injury he was no longer able to perform many of the principal duties of a CBS. And the record supports Lifespan's position.

On December 19, 2022, Dr. Fantry, Mr. Celestin's orthopedic doctor, opined that his injury substantially limited his ability to work, walk, and stand, that he could not ambulate without an assistive device, that he was only able to do seated work, that he was unable to perform the essential functions of his job at that time, and that his impairment would last for a year after his surgery. Ex. H, ADA Provider Verification Form, ECF No. 29-3.

On January 11, 2023, Mr. Celestin returned to work and testified that he was able to work for two and a half shifts without pain, after which he began to experience difficulty walking and standing. *See* Celestin Depo. 31, 75, ECF No. 29-3 ("Celestin Depo."). He also testified that the two and a half days he worked were representative of the normal requirements of his position. *Id.* at 93. Upon visiting urgent care on January 13, 2023, his provider stated that he should "to the extent possible limit the amount of walking." Ex. J, Urgent Care Letter, ECF No. 29-3.

Perhaps, given this record's significant documentation of Mr. Celestin's post-injury physical limitations, he argues that the physical duties of a CBS are not essential to the job, and

claims that the job description's "principal duties" section describes administrative, clerical, and academic support duties, and only the "safety care certification" section describes a CBS's physical requirements. *See* Ex. B, Position Description, ECF No. 29-3. He also argues that his limitations did not impede his ability to carry out all of the physical requirements, only his ability to frequently stand and walk.

But the job description details the essential functions of the CBS position, and includes the ability to frequently stand and walk. Mr. Celestin also must be able to lift up to fifty pounds, occasionally run short distances, and physically escort students for short distances. *See id.* at 2 ("Specifically, such employees must be able to: lift up to fifty pounds; reach with their hands and arms; grasp and hold with their hands; bend/squat kneel without limitation, and physically escort students who may become combative for short distances. Position requires occasional running for short distances, and frequent standing, walking, and sitting."). Indeed, he testified to "frequently" applying protective holds on students. Celestin Depo. at 70 ("There was some times the average was way higher than, like five times a week, yes . . . 'cause we do frequently . . . Yes, more frequent than we would like.").

Although "the inference of minimal qualification is not difficult to draw" where "discharge is at issue and the employer has already hired the employee," *Gregory v. Daly,* 243 F.3d 687, 695–96 (2d Cir. 2001), on this record, there is no genuine issue of material fact as to whether Mr. Celestin could perform the essential functions of the CBS position upon his return to work in January of 2023; he could not.

### 2. The Inference of Discrimination Requirement

Even if Mr. Celestin were able to satisfy the qualifications requirement, he has not established that "the adverse employment action occurred under circumstances giving rise to an

inference of discrimination based on race." *Woods*, 8 F. App'x at 42 (collecting cases). In order to establish a minimal inference of discrimination to survive a motion for summary judgment, the plaintiff "must come forward with at least some credible evidence that the actions of [the Defendant] were motivated by racial animus." *Grillo v. New York City Transit Authority,* 291 F.3d 231, 234 (2d Cir. 2002). "A plaintiff may prove discrimination either by direct evidence of intent to discriminate or 'indirectly showing circumstances giving rise to an inference of discrimination.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (quoting *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) and citing *Tolbert v. Smith*, 790 F.3d 427, 436-37 (2d Cir. 2015)).

Because "direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994)). And though a plaintiff may establish the fourth prong of the prima facie case through a "mosaic" of direct and circumstantial evidence, *Vega*, 801 F.3d at 86, the plaintiff must present more than "conclusory allegations of discrimination," *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 93 (2d Cir. 1996) (citation and internal quotation mark omitted), to survive a motion for summary judgment.

"A plaintiff may raise such an inference of discrimination by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal citations omitted). A similarly situated employee must compare in "all material respects" to the plaintiff, meaning "a reasonably close resemblance of the facts and

15

circumstances of the plaintiff's and comparator[s'] cases, rather than a showing that both cases are identical." *Id.* at 40; *see Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) ("To be similarly situated, the individuals with whom Shumway attempts to compare herself must be similarly situated in all material respects." (internal citations and quotation marks omitted)). "Ordinarily, the question of whether two employees are similarly situated is a question of fact for the jury." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (citation and internal quotation marks omitted).

Here, Mr. Celestin argues that three white female employees, Stephanie Larossee, Ashley, and an unidentified woman, were treated more favorably than him. Mr. Celestin argues that the last two alleged comparators, "Ashley" and an unidentified female employee, were given light-duty work in the office for up to two weeks after suffering a knee and shoulder injury, respectively, in 2022. Obj. at 23. The third comparator, Ms. Stephanie Larossee, allegedly sustained an ankle injury while playing soccer outside of work, and was given a light duty assignment in the main office doing paperwork and filing. Celestin Depo. at 96. At the time of her injury, Ms. Larossee was allegedly working as a CBS. Obj. at 23. Based on his observation of her surgical scar and alleged discussions between them, Mr. Celestin has argued that Ms. Larossee also sustained an Achilles injury. Celestin Depo. at 97.

But this record lacks admissible evidence as to the details regarding these various injuries, their impact on these employees' ability to work, and the extent to which a light duty assignment could be offered to them, in order for a reasonable jury to determine whether they are similarly situated, and that any difference in treatment would give rise to an inference of discrimination. *Cf. Radwan*, 55 F.4th at 133 ("Construing this evidence most favorably to [the plaintiff], a reasonable juror could conclude that [the comparator] was similarly situated to [the

16

plaintiff] in all material respects, but received more favorable treatment as to the alleged misconduct. Both student-athletes were on full scholarships, both engaged in what was defined as unsportsmanlike conduct, and both engaged in such conduct in public, while in uniform on the playing field. Further, both were first-time offenders, [the decision-maker] was personally aware of both incidents, and both student-athletes later expressed remorse."); *see Graham*, 230 F.3d at 40 (requiring "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases" to give rise to an inference of discrimination); *see also Idlibi v. Connecticut Dep't of Pub. Health*, No. 24-720-CV, 2024 WL 4645698, at *3 (2d Cir. Nov. 1, 2024) (applying the Second Circuit's precedent in *Radwan*, and affirming dismissal of a discrimination claim because, *inter alia*, "none of the proffered comparators' conduct appears to have included the same procedures [the plaintiff] conducted or involved a very young child as a patient, both material factors.").

Indeed, there is nothing in this record as to "material factors," such as whether any of these employees had already been granted significant leave with respect to their injuries before their light-duty assignments, i.e., having exhausted their FMLA leave and having sought and been granted additional leave time after the exhaustion of any and all FMLA leave. *See* Celestin Depo. at 93 ("Q: You had exhausted your FMLA leave, correct? A: Yes, I did."); *see id.* at 98 ("Q: . . . [I]sn't it true that you asked for an additional leave? A: Yes. Q: And that was approved? A: It was, yeah."); *see also id.* at 85 ("Q: And so you're asking for an accommodation to extend your leave until January 5, [2023], is that correct? A: Yes. But the appointment did get rescheduled till January 8, [2023], which I stated before.").

There also is nothing in this record as to whether any of these light duty assignments would have been indeterminate as Mr. Celestin's proposed assignment would have been. *See*

17

Celestin Depo. at 93-94 ("Q: . . . So in response to the medical note from urgent care on January 13, you requested to work light duty, correct? A: That was the request of the doctor. . . . Q: But based on the doctor's recommendation, you requested light duty accommodation; is that correct? A: Yes, that's what they requested. Q: Okay. And that was until your next appointment in February. Is that your understanding? A: Yeah, like, whatever came first, like, if I seen the doctor before then. But yes. . . . . Q: . . . But my question was when you were released to light duty on January 13, did you know of a specific date, an end date for that light duty? A: No, cause the urgent care doctor said just I would have to, like, speak to them and stuff.").

Put another way, at the time of Mr. Celestin's light duty request on January 13, 2023, with the exception of the two and a half shifts he worked on January 11, 2023 and January 12, 2023, he had not been to work since August 13, 2022, a five-month period. He then sought a light-duty assignment beyond even that extended period of time without a clear end date. Unlike in *Radwan*, on this record, no "reasonable juror could conclude that [any comparator] was similarly situated to [the plaintiff] in all material respects, but received more favorable treatment as to the alleged misconduct." *Radwan*, 55 F.4th at 133.

Mr. Celestin's additional basis for claiming that there is an inference of discrimination based on his race behind his termination — that the use of racial slurs and the presence of racial tension in the workplace constitute circumstantial evidence of racial discrimination — fares no better.[2] He points to three specific remarks: (1) in a 2019 staff meeting, Mr. Celestin allegedly

---

[2] Mr. Celestin also argues that in September 2021, he and another Black CBS were assigned to work one-on-one with two Black students who were new to the school, and that there was general "racial tension" since employees of different races tended to "segregate." Vague assertions cannot defeat a motion for summary judgment, and the fact that Mr. Celestin and another Black CBS were assigned to work with two Black students alone does not raise an inference of discrimination. *See Raymond v. 1199SEIU Nat'l Benefit Fund*, -- F.4th --, No. 25-707-CV, 2026 WL 2117879, at *7 (2d Cir. July 23, 2026) ("Although we resolve ambiguities in favor of the nonmoving party, conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (internal citations and quotation marks omitted)).

heard an unidentified staff member repeat a student's use of the "n" word; (2) around 2021, colleagues informed Mr. Celestin that Mr. Swartzlander said minority employees dressed "too urban"; and (3) several weeks after Mr. Celestin's termination, in a March 2023 staff meeting, Mr. Swartzlander allegedly used the "n" word.

In assessing whether a remark is a "stray remark" or whether it raises an inference of discrimination, the Second Circuit considers four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)). No single factor is dispositive. *Henry*, 616 F.3d at 150.

The Court will analyze each of the three remarks in turn.

### i. The 2019 Remark

As to the first factor, the remark was allegedly made by an unidentified staff member who Mr. Celestin has not alleged was involved in his termination. And "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Because the staff member played no role in Mr. Celestin's termination, these comments were "not directly related to the adverse action against the plaintiff." *Henry*, 616 F.3d at 150.

As to the second factor, the comment was allegedly made in 2019, more than three years before Mr. Celestin's termination. While "[t]here is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination[,]" "[d]istrict courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination." *Sethi v. Narod*, 12 F. Supp. 3d 505, 540–41 (E.D.N.Y. 2014). Certainly, then, the 2019 remark is too temporally attenuated to support a finding of racial animus. *See id.* (collecting cases); *cf. Bart v. Golub Corp.*, 96 F.4th 566, 578–79 (2d Cir. 2024), *cert. denied sub nom. The Golub Corp. v. Elaine Bart*, 145 S. Ct. 173 (2024) ("Bart has adduced sufficient evidence of discriminatory intent by a supervisor involved in her termination—namely, her testimony that her supervisor made several remarks to her as recently as two months before her termination indicating that women were unsuited to be managers—to defeat Golub's motion for summary judgment and submit the ultimate issue of intentional discrimination to a fact finder.").

The last two factors seek to determine whether a reasonable juror could view the remarks as discriminatory, and asks about the context in which they were made. The Second Circuit has recognized the severe impact that the use of racial epithets can have in the workplace. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11 (2d Cir. 2014) ("[P]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates.").

Nonetheless, the employee did not and could not have made the remark in connection with the decision to terminate Mr. Celestin, since the employee was not involved in this decision,

and the remark was made during a routine staff meeting. *See Sloan v. United Techs. Corp.*, 596 F. App'x 35, 36 (2d Cir. 2015) ("The stray remarks cited by plaintiff were . . . too removed from plaintiff's discharge to support an inference of discriminatory causation.") (citing *Henry*, 616 F.3d at 149-50).

Because at least three of the four factors weigh against a finding of discrimination, the 2019 remark does not create a genuine issue of material fact in support of Mr. Celestin's race discrimination claim.

### ii.   The 2021 Remark

As to the first factor, the remark about minority employees' clothing was allegedly made by Dr. Swartzlander to other employees and then related to Mr. Celestin. Mr. Celestin testified that he believes Ms. Stephanie O'Hanley made the ultimate decision to terminate his employment, *see* Celestin Depo. at 95, but the record also suggests that Mr. Swartzlander and Ms. Bernardo, who denied Mr. Celestin's requests for accommodation, played a significant role in his termination. *See* Swartzlander Decl. 129, ECF No. 29-3 ("[E]xtending Plaintiff's leave any further would have imposed an undue hardship on the program given it was significantly understaffed and we desperately needed to fill Plaintiff's CBS role. Therefore, we denied Plaintiff's requests for a light-duty assignment and/or additional leave."); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (allowing a Title VII plaintiff "to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker so long as the individual shown to have the impermissible bias played a meaningful role . . . in the process") (citation and internal quotation marks omitted).

This remark can be linked to a decision-maker, a factor which leans in the Plaintiff's favor. But, similar to the 2019 remark, it is too temporally attenuated to be probative of

21

discrimination. *See Sethi*, 12 F. Supp. 3d at 540 ("District courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination.") (collecting cases).

As to the third factor, this comment – that certain minority employees dressed "too urban" – arguably is not facially discriminatory. *Cf. Id.* at 541 ("You f—king Indian, what do you think about yourself? I will make sure you are sent back to India. You don't know who you are dealing with. You fear my wrath in your dreams."); *O'Diah v. Yogo Oasis,* 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (finding a statement by an individual at the time the plaintiff was fired that, "You Nigerians can't be trusted," "support[s] the inference that [the individual's] decision to terminate [the plaintiff] was motivated by discriminatory animus.").

As to the fourth factor, Mr. Celestin has not provided any detail as to the context in which the comments were made, only that they were made to other minority employees and later related to him. Not only were these comments not made in connection with the decision to terminate Mr. Celestin, but they are also inadmissible hearsay. *See Pacenza v. IBM Corp.*, 363 Fed.Appx. 128, 130 (2d Cir. 2010) (noting that the Court "is obliged not to consider inadmissible evidence at the summary judgment stage [and] it remains in that court's discretion whether to strike the inadmissible portions or simply disregard them."); *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A]n affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); Fed. R. Civ. P. 56(c)(2) (evidence submitted in support of a motion for summary judgment may be struck if inadmissible); *Sletten v. LiquidHub, Inc.,* 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014) (Comments heard secondhand are less "impactful" and thus "less persuasive").

Thus, the 2021 remark does not create a genuine issue of material fact in support of Mr. Celestin's *prima facie* case of race discrimination.

### iii.  The 2023 Remark

Similar to the 2021 remark, assuming Mr. Swartzlander played a significant role in Mr. Celestin's termination, the first factor weighs in Mr. Celestin's favor. As to the second factor, Mr. Swartzlander's alleged use of a racial epithet occurred several weeks after Mr. Celestin's termination. While reliance on a remark following an employee's termination is unusual in an employment discrimination case, its temporal proximity to the adverse employment action here, combined with the fact that it was uttered by a decision-maker, could be revelatory of Dr. Swartzlander's intent. As to the third factor, as discussed above, the use of racial epithets in the workplace may be severe, though Mr. Celestin has not provided any details as to the context in which it was used, only that Dr. Swartzlander said the "n" word in a staff meeting. Because the comment was made after Mr. Celestin's termination and during a staff meeting, there is nothing in this record to suggest that the alleged comment was made in connection with the decision to terminate Mr. Celestin's employment.

Even though several factors arguably lean in Mr. Celestin's favor, this "stray remark[] of a decision-maker, without more, cannot prove a claim of employment discrimination[.]" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Therefore, the 2023 remark, without more, does not suffice as circumstantial evidence in support of Mr. Celestin's *prima facie* case of race discrimination. *See id.*

In any event, given the specific circumstances of Mr. Celestin's termination, one following a significant absence from the workplace due to his health – not to mention the fact that there is no record evidence of Mr. Celestin ever having raised or even suggested to anyone

that any of these alleged racial remarks affected him in the workplace before his termination –

even if marginally probative, all of these remarks would be properly excluded from consideration

by the jury. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence.")**;** *Vaspasiano v. Metro-N. R.R. Co.*, 638 F. Supp. 3d 141, 151 (D. Conn.

2022) ("Thus, the minimal probative value of the evidence as relevant is outweighed by the

danger of unfair prejudice to Metro-North, and therefore is inadmissible. The prior accidents will

not be considered for purposes of this summary judgment motion."); *Bates v. Falco*, No.

21CIV3009NSRAEK, 2023 WL 6294340, at *6 (S.D.N.Y. Sept. 27, 2023) ("[A]s part of the

summary judgment process, Defendants may request that the Court refuse to consider certain

affidavits or other evidence based on an application of Rule 403 and/or Rule 404 of the Federal

Rules of Evidence."); *Dixon v. Metro. Dist. Comm'n*, No. 14-cv-1468 (VAB), 2017 WL

4247051, at *11 (D. Conn. Sept. 25, 2017) (finding that since evidence from other litigations

would not be admissible at trial under Rule 403, "it cannot be used to defeat summary judgment

in this case"); *see also* Fed. R. Civ. P. 56(c)(2) (evidence submitted in support of a motion

for summary judgment may be struck if inadmissible); *Pacenza v. IBM Corp.*, 363 Fed.Appx.

128, 130 (2d Cir. 2010) (noting that the Court "is obliged not to consider inadmissible evidence

at the summary judgment stage [and] it remains in that court's discretion whether to strike the

inadmissible portions or simply disregard them."); *see also Wanamaker v. Town of Westport Bd.*

*of Educ.*, No. 3:11-CV-1791 (MPS) (WIG), 2013 WL 3816592, at *1 (D. Conn. July 22, 2013)

(noting that "a court may only consider admissible evidence when ruling on a motion for

summary judgment") (citation omitted).

Accordingly, Lifespan's motion for summary judgment will be granted as to Mr. Celestin's Title VII claim.[3]

### B. The ADA Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims of disability discrimination under the ADA are subject to the burden shifting analysis established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973); *see Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020). Once the plaintiff has established a *prima facie* case, the burden then shifts to the defendant to establish a legitimate nondiscriminatory reason for its actions. Then, "the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams*, 764 F.3d at 251 (citing *Bickerstaff*, 196 F.3d at 446).

---

[3] Even if Mr. Celestin were able to establish a *prima facie* case, Lifespan has proffered a legitimate, nondiscriminatory reason for his termination, namely his inability to "perform the essential functions of his job, coupled with the indefinite nature of his continued limitations." Mot. at 21. In his declaration, Mr. Swartzlander also stated that at the time, "New London Regional was experiencing staffing shortages, including shortages in the number of CBS employees, and we therefore could not accommodate extension of Plaintiff's leave through February 17, 2023." Swartzlander Decl. at 128. Although Mr. Celestin argues that the same evidence in support of his *prima facie* case also shows that Lifespan's nondiscriminatory reason for his termination was pretextual, Obj. at 29-30, as a matter of law and as discussed above, these arguments fail, at least on this record.

25

Lifespan argues that Mr. Celestin is unable to establish the third and fourth elements of the *prima facie* case.

The Court will address each issue in turn.

### 1.  The Qualification Requirement

Lifespan argues that Mr. Celestin was not qualified to perform the essential functions of a CBS, with or without a reasonable accommodation, since an accommodation to eliminate the physical aspects of the job would also eliminate the position's essential functions. Mot. at 15-16. Lifespan also argues that the Plaintiff did not carry his burden in identifying a vacant position that would justify reassignment, and that his request for allegedly indefinite leave was unreasonable, especially given the undue hardship it would impose on the allegedly short-staffed team. *Id.* at 16-19.

In response, Mr. Celestin argues that he was capable of performing the essential functions of the job, which he argues only included administrative, clerical, and academic responsibilities and not the de-escalation techniques that required physical actions. Obj. at 13. He argues that Lifespan "made no efforts to provide any accommodation responsive to [his] disability," and that he did not request indefinite leave, but rather "to return to work with some limitation on walking." *Id.* at 16-17. Specifically, he argues that Lifespan did not engage in the interactive process to devise an accommodation. *Id.* He also argues that Lifespan did not carry its burden of showing that an accommodation was unreasonably burdensome, and in any case, this inquiry is a fact-specific one best reserved for a fact finder.

Lifespan replies that Mr. Celestin mischaracterizes the essential functions of the CBS role, and that both the job description and Mr. Celestin's own testimony confirm the physical requirements of the position. Reply at 3-4. Next, Lifespan argues that the medical evidence and

26

Mr. Celestin's testimony confirm that he was unable to perform the essential functions of the job, since "he returned to work still wearing a boot, lasted only two shifts, and was forced to stop working due to pain." *Id.* at 6. Finally, Lifespan argues that "[b]ecause no reasonable accommodation would have enabled Plaintiff to perform the essential functions of the CBS role in the first place, the Court need not reach undue hardship at all." *Id.* at 8.

The Court agrees.

As discussed above, there is no genuine issue of material fact as to whether Mr. Celestin was able to complete the essential functions of the CBS role upon his return to work. *See supra* Section III.A.1. The remaining issue thus is whether a reasonable accommodation existed at Lifespan.

Under the ADA, reasonable accommodations may include "modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (citing 42 U.S.C. §§ 12111(9)(B), 12112(b)(5)(A)). But a "'reasonable accommodation' does not mean elimination of any of the job's essential functions." *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991) (citations omitted).

Here, Mr. Celestin requested a light-duty assignment, which included limiting the amount of walking to the extent possible and wearing a boot. Not. of Removal at 12; Deft's SMF ¶36. Such accommodation, however, would eliminate, at the very least, the essential function that the CBS engage in frequent walking and standing. *See Gilbert*, 949 F.2d at 642 (limiting a "reasonable accommodation" to one that does not eliminate essential job functions). Nor can Mr. Celestin minimize this function by requesting assignment to certain students or classrooms,

since, as he has testified and admitted to, the CBS staff is required to cover various classrooms and respond, often using the physical requirements of the job, to spontaneous behavioral situations. *See* Pl.'s Statement of Material Facts 33, 36-37, ECF No. 34; Celestin Depo. at 57, 64-66, 69-70; *see also Lowry v. Eastman Kodak Co.*, 14 F. App'x 27, 31 (2d Cir. 2001) ("As rotating is an essential function of the boiler operator job, Lowry cannot establish he could perform the job he sought with or without a reasonable accommodation.") (relying on *Gilbert* for the proposition that a "[r]easonable accommodation does not include modifications that would eliminate an essential job function."). Mr. Celestin has also failed to carry his burden in identifying a vacant position to which he could be reassigned. *McBride*, 583 F.3d at 97 ("The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified."); *see id.* at 99 ([Plaintiff] has presented no evidence that, at or about the time of her termination, there existed a vacant position at [the company] for which [the plaintiff] was qualified and reassignment to which would not have involved her promotion.").[4]

Because there exists no genuine issue of material fact as to whether Mr. Celestin was able to conduct the essential functions of the CBS job without an accommodation, and because he has not created a genuine issue of fact as to whether he could carry his burden of identifying a reasonable accommodation, Mr. Celestin is unable to establish a *prima facie* case of discrimination under the ADA.

---

[4] Mr. Celestin states that "[a]s of January 13, 2023, [he] was not seeking leave of absence . . . He was not seeking additional leave. Nor was he requesting that his leave time be extended indefinitely." Obj. at 17. The Court thus need not analyze whether additional leave was a reasonable accommodation. *See McBride*, 583 F.3d at 97 (finding that the plaintiff bears the burden of identifying a reasonable accommodation).

### 2.    The Inference of Discrimination Requirement

Even if he were able to establish a *prima facie* case of discrimination, Lifespan argues that Mr. Celestin has not presented facts to create an inference that he was terminated because of his alleged disability. Lifespan points to the fact that it provided Mr. Celestin with twenty-two weeks of leave, including several extensions, Mot. at 20, and argues that he has not alleged any remarks, or other evidence, that would raise an inference of disability discrimination, *id.*

In response, Mr. Celestin argues that his termination after Lifespan declined to accommodate his disability is sufficient evidence that he was terminated because of that disability. Obj. at 18. He also argues that Lifespan's alleged refusal to engage in the interactive process to identify a reasonable accommodation constitutes additional evidence. *Id.* at 19. He further argues that Lifespan's explanation for rejecting his accommodation, namely the "ongoing hardship to the program in his absence," served to "punish" the Plaintiff for his authorized absence and is further evidence of discrimination. *Id.*

The Court disagrees.

"[A]n employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance that it will be found to have violated the ADA" and that "a failure to engage in a sufficient interactive process where accommodation was, in fact, possible constitutes prima facie evidence of discrimination on the basis of disability." *McBride*, 583 F.3d at 101. "The employer's failure to engage in such an interactive process, however, does not relieve a plaintiff of [his] burden of demonstrating, following discovery, that some accommodation of her disability was possible." *Id.* As discussed above, on this record, Mr. Celestin has not created a genuine issue of fact that an accommodation existed without eliminating an essential job

function, and he also has failed to carry his burden to demonstrate that such accommodation was possible.

Mr. Celestin further fails to provide any record evidence, direct or indirect, to give rise to an inference of discrimination, and instead, he relies on the conclusory allegation that Lifespan allegedly attempted to "punish" him by stating that the school was experiencing "ongoing hardship" due to "his absence." Obj. at 19. But these "conclusory allegations" do not create a genuine issue of fact in support of an inference of discrimination due to his disability. *Cf. Banks*, 81 F.4th at 259 ("[E]ven in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment.") (citation omitted).

Accordingly, Mr. Celestin has failed to establish a *prima facie* case of disability discrimination, and Lifespan's motion for summary judgment will be granted as to his ADA claim.[5]

## IV.    CONCLUSION

For the foregoing reasons, Lifespan's motion for summary judgment is **GRANTED**.

---

[5] Similar to the claim for race discrimination, Lifespan has proffered a legitimate, nondiscriminatory reason for Mr. Celestin's termination. *See* Mot. at 21; Swartzlander Decl. at 128. It is undisputed that Lifespan allowed Mr. Celestin to take five months of leave due to his injury, a period of time beyond what is required by the Family Medical Leave Act. See 29 U.S.C. § 2612(a)(1)(D) (allowing a qualified employee up to twelve weeks of leave due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee"). Courts in this District have recognized that "[a]ddressing staffing shortages or other staffing needs is a legitimate, nondiscriminatory reason for an employment action." *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303 (S.D.N.Y. 2020) (collecting cases). While many of these cases concern adverse employment actions other than termination, here, where Mr. Celestin was given more than five months of authorized leave, and it was unclear when he would regain the ability to complete the essential functions of his role, *see* Deft's SMF ¶37 ("Plaintiff thereafter requested a light-duty assignment and/or additional leave through his next doctor's appointment on February 2, 2023, though he acknowledged that it was not known at that point how long he would continue to require such restrictions, even after the February 2, 2023 doctor's visit."); Celestin Depo. at 93-94 (Q: Okay. But my question was when you were released to light duty on January 13, did you know of a specific date, an end date for that light duty? A: No, 'cause the urgent care doctor said just I would have to, like, speak to them and stuff."), on this record, Mr. Celestin has not created a genuine issue of fact that Lifespan's proffered reason was not a legitimate and nondiscriminatory one. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work."). And Mr. Celestin has provided no record evidence – at least, evidence admissible at trial – to the contrary.

The Clerk of Court is respectfully directed to enter judgment for Lifespan School

Solutions, Inc., the Defendant, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 7th day of August, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE